[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The appeal consists of two consolidated cases, Manatuck Associates v. Town of Fairfield Conservation Commission, D.N. 26-52-92, and Gaynor v. Town of Fairfield Conservation Commission D.N. 26-52-65. The plaintiffs in these two consolidated cases are appealing from a decision of the defendant, the Town of Fairfield Conservation Commission [the "commission"], in which the commission approved the development of two parcels of a ten-lot subdivision, and postponed the development of the remaining eight lots.
The plaintiff, Manatuck Associates, alleges that it is the record owner of a parcel of real property located on Morehouse Lane in the Town of Fairfield. The named defendants in this action are the Town of Fairfield Conservation Commission, the Clerk of the Town of Fairfield, the State of Connecticut Commissioner of Environmental Protection, Mable J. Boyd, Ronna DiPersia, P.O.A. Florence Kaufman, Cordelia Rudkin, F. Joseph Biederman, Elizabeth M. Gaynor, Gabriella P. Dennison, Albert P. Hegyi, Ceil T. Hegyi, Barbara B. Stetson, Frances L. Snyder, Edward L. Synder, Lawrence J. Galaske, Hobart C. Kreitler, Sally S. Kreitler, Joan W. Dupont, John K. Gengler, and Sylvia Bryant.
On June 2, 1989, the plaintiff, Manatuck, filed an application, No. 89-7, with the Town of Fairfield Conservation Commission, acting in its capacity as the Inland Wetlands Commission, requesting a permit to fill within a regulated area for the purpose of subdividing a parcel into ten building lots. (Record Items I-35 and I-48.)
The record reflects that on October 23, 1989, the commission notified the plaintiff by certified mail that the permit application was approved in part and denied in part without prejudice. (Record Item I-54, p. 10.) Specifically, the commission approved, with conditions, the development of lots 2 and 3, and denied the application as it related to lots 1, 4, 5, 7, 8, 9, 10 and 11. (Record Item I-54, p. 10.) The commission advised the plaintiff that, based upon the Connecticut General Statutes, it could not issue a wetlands permit for a proposal that had "significant and adverse affect on a regulated area if the Agency finds that a feasible and prudent alternative exists." (Record Item I-54 CT Page 6312 p. 9.)
The plaintiff instituted an appeal on November 13, 1989. On December 15, 1989, the defendant commission moved to consolidate the Gaynor case with that of Manatuck Associates, claiming that both appeals concerned the defendant commission's decision on the application of Manatuck, that the same record would be used for both cases, and that consistency between the decisions in both cases was essential. The court, Jones, J., granted the motion only as to the return of record. On April 3, 1990, plaintiff Manatuck Associates moved to cite in additional party defendants, and on April 25, 1990, the court, Ford, J., ordered the plaintiff to amend its complaint to include the added party defendants. The added party defendants did not file a separate brief in this action. Among the added party defendants are several neighboring landowners who brought the consolidated appeal, Gaynor v. Town of Fairfield Conservation Commission, D.N. 26-56-65. In accordance with the order to cite in additional party defendants, the plaintiff filed an amended appeal on May 15, 1990.
The plaintiff asks this court to set aside or modify the commission's denial of Application No. 89-7, and to order the defendants to grant said application. The plaintiffs in Gaynor v. Town of Fairfield Conservation Commission are Elizabeth Gaynor, Albert P. Hegyi, Ceil T. Hegyi, Barbara B. Stetson, Frances L. Snyder, Lawrence J. Galaske, Hobart C. Kreitler, Sally S. Kreitler, and Henry B. Dupont, III. The defendants in this appeal are the Conservation Commission of the Town of Fairfield, Manatuck Associates, and the Commissioner of Environmental Protection. The plaintiffs Gaynor et al. instituted an appeal of said Commission's decision on November 17, 1989, requesting this court to sustain their appeal and enter judgment denying the subject application in its entirety.
Appeals from decisions of an inland wetlands agency are taken pursuant to Conn. Gen. Stat 22a-43 (rev'd to 1989) (amended by 1989 Conn. Acts 89-356, 9 (Reg. Sess.) (Copy attached.) In order to take advantage of a statutory right to appeal from an administrative agency decision, the parties must strictly comply with the statutory provision that creates such a right. Simko v. Zoning Board of Appeals, 206 Conn. 374, 377
(1988). These provisions are jurisdictional and mandatory, and failure to comply subjects an appeal to dismissal. Id. at 377.
Aggrievement is a prerequisite to maintaining an appeal. See Huck v. Inland Wetlands and Watercourses Agency, 203 Conn. 525,530-31 (1987). Conn. Gen. Stat. 22a-43 (a) (rev'd to 1989), as amended, provides that "any person aggrieved by any regulation, order, decision or action made pursuant to sections 22a-36 to CT Page 631322a-45, inclusive, by the commissioner, district or municipality or any person owning or occupying land which abuts any portion of land or is within a radius of ninety feet of the wetland or watercourse involved in any regulation, order, decision or action made pursuant to said sections may appeal to the superior court in accordance with the provisions of section4-183. . . ." During the October 30, 1990 hearing before the court, a partner in Manatuck Associates, Mr. Bruggeman, testified to the fact that his company owned the subject lots, and a warranty deed was submitted into evidence. (Plaintiff's Exhibit 1.) The court finds that the plaintiff, Manatuck, is aggrieved. See Bossert Corp. v. Norwalk, 157 Conn. 279, 285
(1968) (an owner of the subject property is aggrieved and entitled to bring an appeal). Based on evidence presented at said October 30 hearing, the Court finds all the named plaintiffs in Gaynor v. Town of Fairfield Conservation Commission, with the exception of Barbara B. Stetson, to be aggrieved. All references to plaintiff in this memorandum refer to Manatuck Associates unless designated otherwise.
"[T]he reviewing court may search the record for reasons to support the agency's decision.'" Gagnon v. Inland Wetlands and Watercourses Commission, 213 Conn. 604, 609 (1990) (Citation omitted.) "The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." Huckland v. Inland Wetlands and Watercourses Agency, 203 Conn. 525, 539-40 (1987) (Citations omitted.) "The evidence, however, to support any such reason must be substantial . . ." but, "`the credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency."' Id. at 540-41 (Citations omitted.) "`The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . ."' Id. at 542 (Citations omitted.)
"`This so-called substantial evidence rule is similar to the `sufficiency of the evidence' standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords' a substantial basis of act from which the fact in issue can be reasonably inferred . . . Id. at 541 (Citations omitted.) "[I]n defining `substantial evidence'" the United States Supreme Court "has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."' Id. (Citation omitted.) CT Page 6314
Further, the Connecticut Supreme Court has stated that "an administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." Id. at 542 (citation omitted).
The defendant commission's decision states:
 The Connecticut General Statutes as amended, require that a wetland permit shall not be issued for a proposal having a significant and adverse affect [sic] on a regulated area if the Agency finds that a feasible and prudent alternative exists. In order to accomodate [accommodate] the applicant's immediate needs to begin development yet prevent the significant, adverse and unnecessary loss of wetlands and watercourses on the site, it is determined that a feasible and prudent alternative to the application will allow partial development of the site in those areas having the lowest potential for adversely affecting the regulated area, while postponing development of those lots wholly or partially contained within a regulated area until a permanent road access route and mitigation plan have been approved.
 Lots 2 and 3 are approved with conditions and the requirement that no artificial increase in storm water be discharged from these lots and no portion of the lane or culvert be disturbed, including buried utilities.
 Lots 1, 4, 5, 7, 8, 9, 10 and 11 are denied without prejudice at this time.
 This decision and these conditions are consistent with the purposes of the Fairfield Inland Wetlands Ordinance which is designed to protect the citizens of the Town of Fairfield by providing a balance between the need CT Page 6315 for growth, development and enjoyment of the natural resources of Fairfield with the need to protect its environment and ecological stability.
(Record Item 54, pp. 9-10.)
"The broad legislative purpose of the wetlands act is set forth in General Statutes 22a-36." Red Hill Coalition, Inc. v. Conservation Commission, 212 Conn. 710, 718 (1989). "That section states that the purpose of the act is to protect and preserve inland wetlands and watercourses `by providing an orderly process to balance the need for economic growth of the state and the use of its land with the need to protect its environment and ecology . . . ."' Id. at 719.
"The scope of municipal regulations is governed by 22-42
(e), which provides in relevant part that: `any ordinances of regulations shall be for the purposes of sections 22a-36
to 22a-45 inclusive, and, a municipality or district, in acting upon ordinances and regulations shall give due consideration to the standards set forth in 22a-41.'" Red Hill Coalition 212 Conn. at 720. "Section 22a-41 (a) . . . provides that municipal or district commissions' shall take into consideration all relevant facts and circumstances, including but not limited to: [the six factors enumerated in the statute]"'. Id. at 721. (Emphasis in original.) The six factors enumerated in section 22a-41 (a) provide:
 Sec. 22a-41 Factors for consideration of commissioner. Finding of no feasible or prudent alternative. (a) In carrying out the purposes and policies of sections 22a-36
to 22a-45, inclusive including matters relating to regulating, licensing and enforcing of the provisions thereof, the commissioner `shall take into consideration all relevant facts and circumstances, including but not limited to:
 (1) The environmental impact of the proposed action;
 (2) The alternatives to the proposed action;
 (3) The relationship between short-term uses of the environment CT Page 6316 and the maintenance and enhancement of long-term productivity;
 (4) Irreversible and irretrievable commitments of resources which would be involved in the proposed activity.
 (5) The character and degree of injury to, or interference with, safety, health or the reasonable use of property which is caused or threatened; and
 (6) The suitability or unsuitability of such activity to the area for which is proposed.
Conn. Gen. Stat. 22a-41 (rev'd to 1989).
Section 22a-41 (b) (rev'd 1989) provides:
 In the case of an application which received a public hearing, a permit shall not be issued unless the commissioner finds that a feasible and prudent alternative does not exist. In making his finding the commissioner shall consider the facts and circumstances set forth in subsection (a). The finding and the reasons therefore shall be stated on the record.
The plaintiff, Manatuck Associates, initially argues that the defendant commission abused its discretion when it denied the plaintiff's inland wetlands application because the commission failed to apply the pertinent regulatory standards. (Plaintiff's Brief on Wetlands Appeal, dated June 5, 1990, p. 4.) Specifically, the plaintiff points out that section 6.1 of the town of Fairfield Inland Wetlands and Water Courses Regulations sets forth the information to be considered by the commission in reaching its final decision concerning a permit application. (Plaintiff's Brief at 4-5.) The plaintiff asserts that its environmental expert addressed each of the issues delineated in section 6.1 (Plaintiff's Brief at 5.)
The plaintiff notes that its expert concluded that:
 The project does not result in the adverse impact to the wetlands systems and therefore no alternative is proposed CT Page 6317
 Low density residential development provides long-term gains to the Town of Fairfield by increasing house stock, tax base, etc., with minimal impact to the natural environment.
 The proposed project has been designed to eliminate any impact to the wetlands system and, therefore, will not experience an irretrievable or irreversible loss or commitment under the proposed development.
 The development does not pose a risk of injury or safety to the use of the property and is in keeping with the surrounding land use which is already used for residential dwellings.
 The proposal is well within the capacity of land resources to support the project which is a low density residential land use area.
 The sediment and erosion control plan and drain design fully mitigate any impacts associated with the proposal, the erosion control plan meets the state standard established by the State of Connecticut and that sedimentation of on-site and downstream wetlands does not occur.
 The drainage design calls for underground attention [sic] on each lot which will mitigate the impact of storm water runoff.
Plaintiff's Brief at p. 6, citing to Record Item I-4, Attachment: Environmental Review Questions.)
Finally the plaintiff concludes that "the record is devoid of factual information provided to the commission which contradicted the expert testimony and other information supplied by the Plaintiffs." (Plaintiff's Brief at p. 10.)
The defendant commission counters:
 In its discussion of the anticipated impact of this plaintiff's proposal, CT Page 6318 the Commission dealt with issues of storm water runoff, extensive lot grading, lack of detailed drainage plans, concentrated runoff leading to erosion, decreased water quality, pollution of Great Brook, increased flooding, driveway, access to the public right-of-way requiring culverts and drainage controls, and inadequate soil and erosion controls.
(Defendant Conservation Commission Brief, dated July 13, 1990, at p. 2, citing Record Item I-54, pp. 6-9.) The commission further maintains:
 The evidence on which the Commission's decision was based was generated not only from the neighbors and their expert but from the staff and interdepartmental reviews of the Town of Fairfield. These reviews, recommendations and comments from the staff were part of the public record, were available for cross-examination and were, in fact, addressed by the applicant during the course of the public hearings.
(Defendant's Brief at p. 2.)
Section 6 of the Inland Wetlands and Water Courses Regulations of the Town of Fairfield provides in relevant part:
SECTION 6
RENDERING DECISION AFTER FINAL REVIEW
6.1 The Agency shall consider the following in making its final decision on a permit application:
6.1.1 All evidence offered at or before any public hearing.
6.1.2 Any reports from other commissions and/or federal or state agencies, including the Fairfield County Soil and Water Conservation District and/or the Connecticut Department of Environmental Protection.
6.1.3 Additional requested information CT Page 6319
6.1.4 All revelant facts and circumstances, including but not limited to the following:
 6.1.4.1 The alternatives to the proposed action including a consideration of alternatives which might enhance environmental quality or have a less detrimental effect, and which could feasibly attain the basic objectives of the activity. This should include but is not limited to the alternatives of the Agency taking no action, or postponing action pending further study, provided that the applicant consents to an extension of the time periods provided for in these Regulations, or the alternative of requiring actions of a different nature which would provide similar benefits with different environmental impacts, such as using a different location for the activity.
6.1.4.2 The environmental impact of the proposed action including, but not limited to the cumulative environmental impact of similar projects, the effects of the inland wetlands and watercourse's natural capacity to support desirable biological life, to prevent flooding 6.1.4.2 The environmental impact of the proposed action including, but not limited to the cumulative environmental impact of similar projects, the effects of the inland wetlands and watercourse's natural capacity to support desirable biological life, to prevent flooding, to supply water, to control sediment, to facilitate drainage, and to promote public health and safety.
6.1.4.3 The relationship between the short-term uses of the environment and the maintenance and enhancement of long-term productivity, including consideration of the extent to which the proposed activity involves trade-offs between short-term environmental gains at the expense of long-term losses, or vice versa, and consideration of the extent to which the proposed action forecloses future options. CT Page 6320
6.1.4.4 Irreversible and irretrievable commitments of resources which would be involved in the proposed activity. This requires recognition that the inland wetlands and water courses of the Town of Fairfield are an indispensable and irreplaceable but fragile natural resources, and that these areas may be irreversibly destroyed by deposition, filling and removal of material, by the diversion or obstruction of water flow, and by the erection of structures and other uses.
6.1.4.5 The character and degree of injury to, or interference with, safety, health, or the reasonable use of property which would be caused or threatened. This includes recognition of potential damage from erosion, turbidity, or siltation, loss of fish and other beneficial aquatic organisms, wildlife and vegetation; the dangers of flooding and pollution; and destruction of the economic, aesthetic, recreational and other public and private uses and values of wetlands and watercourses.
6.1.4.6 The suitability of such action to the area for which it is proposed. This requires the Agency to balance the need for economic growth of the Town and the use of its land, with the need to protect its environment and ecology for the people of Fairfield and the benefit of generations yet unborn.
6.1.4.7 Measures which would mitigate the impact of the proposed activity and may be imposed as conditions of the permit. Such measures include the availability of further technical improvements of safeguards which could feasibly be added to the plan or action to avoid the reduction of the wetland's or water course's natural capacity to support desirable biological life, prevent flooding, supply water, control sedimentation and/or prevent erosion, assimilate wastes, facilitate drainage, and provide recreation and open
(Record Item I-1, pp. 20-21.)
The commission concluded that a "feasible and prudent alternative to the application will allow partial development the site in those areas having the lowest potential for adversely affecting the regulated area, while postponing development of those lots wholly or partially contained within a regulated area until a permanent road access route and CT Page 6321 mitigation plan have been approved." (Record Item I-54, p. 9.) (Emphasis added.) This "feasible and prudent alternative" to the application was contained in the Conservation Director's Staff Review and Recommendation. (See Record Item I-32, p. 8.)
The commission decided that the impacts resulting from the lot development and anticipated improvements to the access road would result in increased storm water runoff, increased soil erosion, decreased water quality and pollution of Great Brook, and a cumulative increase in flooding of this area (Record Item I-54.)
The commission acted outside the scope of its authority in considering the anticipated improvements to the access road.
The record shows that the commission also addressed the relationship between the short-term uses of the environment and the maintenance and enhancement of long-term productivity, as required by section 6.1.4.3. The commission concluded that the present site is a "sensitive and valuable regulated area . . ." (Record Item I-54, p. 9.) The commission further stated that "[n]o land is provided for necessary storm water detention, groundwater recharge or biofiltration to improve stormwater runoff quality no land or easements are provided to maintain the bridle trail system through the property." (Record Item I-54, p. 8.) The commission noted that "no restoration or mitigation plan has been submitted to compensate for the aforementioned losses or for the significant and unnecessary impacts upon the regulated area." (Record Item I-54, p. 8.) The commission's statements are based upon the aforementioned Staff Review and Recommendation. (See Record Item 32, p. 7.)
The record also reveals that, in accordance with section 6.1.4.4., the commission considered the irreversible and irretrievable commitments of resources that would be involved in the proposed activity, and the commission stated that "[t]he regulated area supports a diverse and very high quality wetland ecosystem," (Record Item I-54, p. 4), and is a "sensitive and valuable regulated area."
(Record Item I-54, p. 9.) The commission's statement is based on the Staff Review and Recommendation. (See Record Item I-32, p. 4). The commission observed that the erection of the residential structures would result in displaced storm water runoff, erosive surface runoff, and would involve the pollution of Great Brook and a decrease in the brook's water quality. (Record Item I-54, p. 6.) Again, the commission's statement is based upon the Staff Review and Recommendation. (See Record Item I-32, p. 5-6.) CT Page 6322
The record indicates that the commission found that potential damage would occur from siltation, flooding and pollution, as well as a detrimental impact on the ecological, scenic and historic attributes of the area. (Record Item I-54, p. 6-9.) The commission's position is again based on the Staff Review and Recommendation of the Conservation Director.
(Record Item I-32.)
Section 6.1.4.6 requires the commission to consider the suitability of a proposed action to the area for which it is proposed by requiring the commission to balance the need for the town's economic growth and the use of its land with the need to protect its environment. The commission did not explicitly address the issue of the town's economic growth, but it concluded that "these lots are contributory to the erosion, siltation, storm water flooding, detention, groundwater recharge and poor water quality problems associated with the subdivision." (Record Item I-54, p. 9.) The commission's conclusion is taken from the Staff Review and Recommendation. (Record Item I-32, p. 6.)
The commission emphasized that these problems must be addressed by the applicant and must be "incorporated in the overall development and mitigation plan."
Finally, the record reflects that the commission, imposed conditions on the approved sites. (Record Item I-54, p. 10.) The commission ordered that lots 2 and 3 must not involve any artificial increase in storm water discharge, and that "no portion of the lane or culvert could be disturbed, including buried utilities," (Record Item I-54, p. 10), and the commission postponed development of the remaining lots until a permanent road access route and mitigation plan have been approved. (Record Item I-54, p. 10.) The conditions imposed by the commission with the exception of the approval of a permanent road access route, discussed below, are again taken from the Staff Review and Recommendation. (See Record Item I-32, p. 8.)
The plaintiff argues that section 4.6 of the Town of Fairfield regulations sets forth certain environmental performance standards that must be addressed, and the court finds that its expert addressed these standards. (Plaintiff's Brief at p. 7.)
Section 4.6 provides that the following environmental performance standard must be addressed:
4.6 Environmental performance standards. In order to more CT Page 6323 effectively administer these regulations, facilitate the application review process and enhance proposal formulation by a prospective applicant, the following environmental standards of performance shall be used in evaluating the degree to which a particular application satisfies the intent of the wetlands ordinance and specified in its statement of purpose. These standards specify the acceptable degree to which the ecological functions of the regulated area are restored or maintained on a permanent basis following implementation of a regulated activity. All inland wetland applications must address the following standards before such applications will be considered complete.
4.6.1 Provision for erosion and sediment control: This function may be achieved during and after the conduct of a regulated activity through the practices prescribed in the "Erosion and Sediment Control Handbook for Connecticut" dated 1976, and as periodically revised by the U.S. Soil Conservation Service, U.S. Department of Agriculture. Erosion and sediment control practices, if required, shall be specified in a sediment and erosion control practices, if required, shall be specified in a sediment and erosion control plan which plan shall include the requisite practices, their location, relative time of implementation and frequency of inspection and maintenance.
4.6.2 Provision for hydrological and hydraulic stability: This complex related to the quality and quantity of surface and ground waters may be achieved during and after the conduct of a regulated activity through:
4.6.2.1 Provision for the on-site detention of the artificial increase in storm water runoff due to development, with detention volumes based on the ten (10) year storm of appropriate duration and discharge predicted on the two (2) year storm's predevelopment rate as prescribed by an approved flood flow formula when such runoff is generated above the natural flood plain for the ten (10) year storm as defined by the Army Corps of Engineers — HUD Flood Insurance Program.
4.6.2.2 Provision for the maintenance of a site's natural capacity to purify runoff and provide for ground water infiltration and exfiltration during and after the conduct of a regulated activity. For example, ground water recharge may be achieved during the storm water detention period through the use of a porous basin lining or distribution field.
4.6.2.3 Provision for maintaining a site's natural capacity to accommodate periodic flooding without adversely affecting land use within a regulated area shall be commensurate with and CT Page 6324 adversely proportional to the relative degree of flooding expected from the one hundred (100) year storm.
Land use and development proposals for regulated areas within riverine and coastal flood plains shall not service to directly or directly endanger human life or property nor be inconsistent with the philosophy and provisions of the U.S. Department of Housing and Urban Development Flood Insurance Program.
4.6.3 Provisions for maintaining plant and animal habitat. Existing functional habitats shall be maintained or improved for appropriate aquatic, avian, terrestrial, indigenous or migratory forms of plant and animal life periodically found in some stage of ecological succession within the Town of Fairfield.
The plaintiff emphasizes that its expert required the installation of anti-tracking aprons at the entrance of each lot, downslope silt fencing and stockpiled areas, and that all stripped surfaces that are left exposed after development are to be seeded and mulched. (Plaintiff's Brief at p. 7.) The record supports the plaintiff's assertion that it has provided such sediment and erosion control specifications. (See Record Item I-2.)
The plaintiff admits that peak storm water flows will slightly increase, but argues that its expert addressed hydrological and hydraulic stability by providing for roof leader dry wells or other underground detention structures. (Plaintiff's Brief at p. 7.) The record reflects that the plaintiff has provided for roof leader dry wells. (See Record Item I-2.)
The Conservation Director's Staff Review and Recommendation maintains that these roof leader dry wells will not compensate for the anticipated increased runoff. (See Record Item I-32, p. 6.) However, no contradictory expert opinion was cited.
The plaintiff's expert indicated that the site's natural capacity to purify water and provide for ground water would not be altered by the proposed development, and that the proposed detention facilities located on each lot will also function for ground water recharge. (See Record Item I-4, Attachment: Environmental Review Questions, 14.c.)
The plaintiff's expert concluded that the site's capacity to accommodate flooding would be maintained under the proposed development conditions and that the development would have little impact on flooding patterns in the area. (See Record CT Page 6325 Item I-4, Attachment: Environmental Review Questions, 14.d.)
The plaintiff's expert indicated that, with respect to maintaining plant and animal habitats, the proposed development would not impact the wetlands system in any manner. (See Record Item I-4, Attachment: Environmental Review Questions, 14-e.)
Finally, the plaintiff emphasizes that its expert has concluded that since the proposed development will not result in any adverse impact to the wetlands system, no alternative is proposed. (Plaintiff's Brief at 8.) The record reflects that the plaintiff's expert reached this conclusion. (See Record Item I-4, Attachment, Environmental Review Questions, 15.a.) The record reflects that the plaintiff, as required by 4.6 of the town regulations, did address the necessary environmental performance standards. The conclusions reached by the plaintiff's expert have been contradicted by the conclusions stated by the Conservation Director concerning the plaintiff's hydrological and hydraulic stability provisions, i.e., the provision of roof leader dry wells. "A reviewing court must take into account [that there is] contradictory evidence. . . but `the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ."' Huck v. Inland Wetlands and Watercourses Agency, 203 Conn. 525,542 (1987) (citation omitted). In this case, however, not only do the Conservation Directors conclusions conflict with plaintiffs expert, they also conflict with his own conclusions in an earlier review concerning the same property.
The Staff Review and Recommendation relied upon by the commission in reaching its present decision regarding Application No. 89.7 is in conflict with an earlier Staff Review and Recommendation that was provided to the commission concerning the plaintiff's previous application, Application No. 89-2. The Staff Review and Recommendation relating to Application No. 89-2 provided that "`if the aforementioned design changes, easements and bonds are incorporated in the proposal the application may be approved with conditions.'" (Record Item II-36, p. 9.) Said "`design changes, easements and bonds" primarily involved work related to road construction." Application No. 89-7 is virtually identical to Application No. 89-2, except that Application No. 89-7 does not propose any road construction. The plaintiff states that "there is no credible basis for the conclusion arrived at by the Staff in its Review and Recommendation related to Application No. 89-7"
(Plaintiff's Brief p. 9.) CT Page 6326
The later Staff Review and Recommendation is in conflict with the earlier one. However, in an attempt to explain the conflict, the Conservation Director wrote to the plaintiff's attorney on August 29, 1989 explaining the different conclusion reached in the later Staff Review and Recommendation:
 On first cut I originally thought the proposal was innocuous — conceptually it is, but after examining the proposal and the site in detail, I think its implementation will have a significant adverse effect on the regulated area. I know this is contrary to my earlier thinking with you, but at that time I had not examined the plans or realized the problems to be encountered in development.
(Record Item I-33.)
The court notes that previous to "examining the proposal and the site in detail", the Conversation Director managed to write a detailed nine page review and recommendation (Record Item 11 36.) Specifically, the plaintiff maintains that "the basis of the Decision turns not on any issue within the Commission's jurisdiction but on the present and future condition of Morehouse Lane. This simply was not within the scope of the subject Application". (Plaintiff's Brief at p. 12.) The plaintiff argues that even if "the issue of road access and conditions could properly be considered by the Commission, it is properly a matter of concern of the Zoning Commission and not the Inland Wetlands Agency.
Further, it is well settled that a municipality cannot deny an application for development based upon the condition of a public road." (Plaintiff's Brief at p. 14.).
The defendant commission contends:
 Substantial impacts as a result of the development of the subdivision lots, quite apart from any work which might have to be done with respect to the public right-of-way, were shown and were relied upon by the Commission in taking the action that it took. In addition to the impact caused by the development of the lots, the very practical aspect of providing access CT Page 6327 to the lots over a public right-of-way and the introduction of public utilities to service those lots, all of which would have had a further and substantial impact on the regulated area, were also considered. Whether it would be the applicant or the Town of Fairfield coming back before the Commission to improve the right-of-way, was an item left open to question. What was not left open to question was that such improvement had to be forthcoming.
The record reveals that the commission did consider the present condition of Morehouse Lane and the anticipated negative impacts that would result from the reconstruction of the road. (Record Item I-54, pp. 5-9.) The commission noted that "[w]here it crosses Great Brook, Morehouse Lane has a 9 1/2' to 10' wide traveled way composed of oiled gravel over a 4' diameter pipe culvert." (Record Item I-54, p. 5.) It further characterized this road as a "two foot high elevated road surface in the upland area and [it] acts as a dam to surface drainage from the new lots." (Record Item I-54, p. 5.)
The commission emphasized that the "Morehouse Lane right-of-way . . . of necessity must be graded to provide lot access and drainage and will therefore create severe erosion and sediment problems downslope in the regulated area." (Record Item I-54, p. 8.) It also observed that "the applicant has limited all site access from Hulls Farm Road and, for the applicant's property along. . . [Morehouse Lane], to a 50 — 70 foot right-of-way which brackets the old lane . . . ." (Record Item I-54, p. 8.) The commission maintained that the necessary reconstruction of Morehouse Lane "will result in the significant disturbance of the existing route with total loss of the stone walls and tree-lined lane in this area along with the concomitant loss of ecological, scenic and historic values. (Record Item I-54, p. 8.)
Conn. Gen. Stat. 8-25 (a) (rev'd to 1989) provides that "[n]o subdivision of land shall be made until a plan for such subdivision has been approved by the [municipal planning] commission Id. Section 8-25 also provides that the regulations promulgated by a municipal planning commission:
 [S]hall provide that the land to be subdivided shall be of such character that it can be used for building purposes without danger to health or CT Page 6328 the public safety, that proper provision shall be made for water, drainage and sewerage and, in areas contiguous to brooks, rivers or other bodies of water subject to flooding. . .that proper provision shall be made for protective flood control measures that the proposed streets are. . . so arranged and of such width, as to provide an adequate and convenient system for present and prospective traffic needs.
In Weatherly v. Town Planning and Zoning Commission,23 Conn. App. 115 (1990), the court had occasion to interpret section 8-25. In Weatherly, the court was faced with the question of whether the trial court had properly concluded that the Town of Fairfield Planning and Zoning Commission had no authority to adopt subdivision regulations governing the width of existing streets that abut proposed subdivisions. Id. at 116. (Emphasis provided.) The regulation in question provided that "[s]ection 2.1.10 of the Fairfield subdivision regulations provides `Existing Streets: Proposed subdivisions abutting and existing Town street shall provide for proper construction and widening of a said street to 50 feet or to a greater width depending upon the classification given said street by the Commission.'" Weatherly, 23 Conn. App. at 118, n. 4 (citing to Town of Fairfield subdivision regulation).
The Weatherly court determined that, pursuant to Conn. Gen. Stat. 8-25, the town's planning and zoning commission had the authority to "regulate the width of both proposed and existing streets that abut proposed subdivision." Id. at 122 (emphasis provided). The court stated that the applicant could satisfy the relevant subdivision regulations by dedicating a portion of his property to the town so that the town could widen the road to its own specification. Id. at 123. It should be noted the Weatherly concerned the subdivision regulations of the Town of Fairfield.
There is evidence in the record that indicates that Morehouse Lane is a town road. (Record Item I-37.)
In the instant case, the potential reconstruction of the road was not part of Application No 89-7. (Record Item I-4.) However, in determining that Morehouse Lane "of necessity" must be reconstructed to provide lot access, (Record Item I-54, p. 8), and then conditioning subsequent approval of plaintiff's application on "securing approval for a permanent road access route," CT Page 6329 (Record Item I-54, p. 9), the commission, in effect, sought to regulate the width of Morehouse Lane, a power which has been given to the planning and zoning commission under Conn. Gen. Stat. 8-25 and 8-26.
Therefore, the Planning and Zoning Commission, not the Inland Wetlands Commission, has the authority to require the widening of existing roads or the construction of new roads to service a subdivision.
The plaintiff next argues that there was no contrary probative expert evidence presented by, or on behalf of, the agency. (Plaintiff's Brief at p. 16.) The testimony of the neighbors' environmental consultant did not rebut the expert evidence provided by the plaintiff, as her entire testimony was based on speculation concerning future undefined and uncertain improvements to Morehouse Lane. The plaintiff further contends that no other technically qualified individual testified in opposition to matters relating to the application. (Plaintiff's Brief at p. 16.)
The defendant argues that although "the qualifications of the professional staff members of the Commission are not part of the Record, `the simple answer is that the plaintiffs, though given a full opportunity to challenge both (the staffs') qualifications — chose not to do so."' (Defendant's Brief at p. 3, quoting Kaeser v. Conservation Commission, 20 Conn. App. 309,320 (1989) (Berdon, J., concurring)). The defendant further observes that "[t]here is a presumption that a public official duties lie until the contrary is shown." (Defendant's brief at p. 3, quoting State v. Main, 69 Conn. 123, 140
(1897)).
The neighbors' environmental expert presented testimony at the October 3, 1989 public meeting. (Record Item I-48, pp. 26-32.) The environmental analyst's testimony primarily was devoted to posing a series of environmentally-related questions that pertained to the issue of Morehouse Lane. (Record Item I-48, pp. 26-32.)
The plaintiff argues that the commission referred to anticipated adverse impacts due to storm water runoff and flooding that were not supported by any of the evidence before. (Plaintiff's Brief at p. 18, citing to Record Item I-54, pp. 6, 7.) The plaintiff claims that the record is devoid of any evidence that would establish that the proposed activity would result in "any long-term adverse impacts from increased volumes of water, decreased soil and groundwater recharge of water, or that road sands and salts would in any way degrade the wetlands and CT Page 6330 watercourse." (Plaintiff's Brief at p. 19.) The plaintiff maintains that each of these matters was carefully reviewed and addressed by the plaintiff's experts, Jodie Chase, an environmental consultant, and David Huntington, an engineer. (Plaintiff's Brief at p. 19.) Quoting from the record, the plaintiff states:
 We don't have any concentrated runoff. All of our runoff is sheet runoff, which will be dissipated on existing land. We're not concentrating it anywhere. We have no, no storm drains, no discharge points, or any, any areas or points where concentrated flow can occur. . . . We are not increasing the runoff.
(Plaintiff's Brief at p. 19. citing to Record Item 48, pp. 3-5.)
The defendant argues that it based its decision on evidence generated from the neighboring landowners, the neighbors' expert, and evidence garnered from staff and interdepartmental reviews. (Defendant's Brief at p. 2.) A reading of the decision would lead one to believe that the Commission's decision is based entirely on the Stall Review and Recommendation. (Record Item I-32.)
The defendant further argues that it dealt with the issues of "storm water runoff, extensive lot grading, lack of detailed drainage plans, concentrated runoff leading to erosion, decreased water quality, pollution of Great Brook, increased flooding, driveway access to the public right-of-way requiring culverts and drainage controls, and inadequate soil and erosion controls." (Defendant's brief at p. 2, citing to Record Item I-54, pp. 6-9.)
The record includes the following evidence: Environmental Review Questions, prepared for Manatuck Associates by its environmental consultant (Record Item I-4 Attachment); a Drainage Report, prepared for Manatuck Associates by an engineering and surveying company (Record Item I-4, Attachment); a Soil Report, prepared for Mantuck Associates by a soil scientist (Record Item I-4, Attachment); a Subdivision and Grading Plan and a Property Map Showing Soils (Record Items I-2 and I-3.) The record also includes a Staff Review and Recommendation, submitted by Thomas J. Steinke, the town's Conservation Director (Record Item I-32); testimony from the neighbors' environmental analyst (Record Item I-48, pp. 26-32); as well as the neighboring landowners' personal observations of the area (Record Items I-44-47; I-48, pp. 33-42). These record CT Page 6331 items are associated with Application 89-7, but the defendant states that it also based its decision on record items associated with Application No. 89-2.)
The commission approved, with conditions, the application as it pertained to lots 2 and 3, and it denied the application without prejudice, as it related to the remaining eight lots.
The commission observed that the plaintiff had based its storm water runoff calculations upon the assumption that all the lots were "homogeneous with respect to their runoff characteristics as contributing to storm water flows." (Record Item I-54, p. 6.) The commission noted that such an assumption failed to reflect "the considerable storage presently provided in low areas such as on lots 1, 2, and 9; and their loss due to grading and filling for houses, roof dry wells and yard areas will result in commensurate increases in displaced runoff not reflected in the drainage design." (Record Item I-54, p. 6.) The commission does not cite to the record in support of this anticipated impact, but again relied upon the Conservation Director's Staff Review and Recommendation for this observation. (See Record Item I-32.) The evidence in the record indicates that the applicant did calculate its peak flows and storage requirements "by analyzing a typical lot which has 1.5 acres of developed area and "[p]re-development and post-development flows were than [sic] determined for this 1.5 acres of developed area." (Record Item I-4, Attachment: D Report.)
The commission noted that the applicant had provided "storage and groundwater recharge volumes for the 1.5 acre house, driveway and yard areas equivalent to the 100 year storm in the form of galleries or dry wells from roof leaders." (Record Item I-54, p. 6.) The commission maintained that "[t]his excessive and unuseable storage volume for roof leader water in dry wells will not compensate for the increased erosive surface runoff from the improved lawn and driveway impervious surfaces which must be accommodated in a storm sewer drainage system." (Record Item I-54, p. 6.) The only support for the commission's statement is found in the Conservation Director's Staff Review and Recommendation. (See Record Item I-32, p. 6.)
The commission also stated that the "applicant's plans reflect the need for extensive lot grading to meet site conditions and ensure satisfactory yard drainage." (Record Item I-54, p. 6.) The commission further maintained that the applicant had not provided any detailed drainage plans. (Record Item I-54, p. 6.) The commission did not specify what comprises a "detailed drainage plan," and the record reveals CT Page 6332 that the plaintiff did submit a Drainage Report. (See Record Item I-4, Attachment.) The commission, relying upon its Staff Review and Recommendation, concluded that "[c]oncentrated runoff will scour and erode downslope areas leading to the sedimentation of the regulated area resulting in significant loss of water quality and aquatic life in Great Brook." (Record Item-32, p. 6.) However, the plaintiff's expert had previously contended that "[w]e don't have any concentrated runoff." (Record Item I-48, p. 4.) The expert explained that all of the runoff was sheet runoff which would be dissipated on the existing land. (Record Item I-48, p. 4.) The commission emphasized that because no driveway culverts were proposed for the lots, water would be dammed up and spill into "the travelled way, yards, and Morehouse Lane where it will flood the road and freeze to a dangerous condition." (Record Item I-54, p. 6.)
The record does reflect that the plaintiff has failed to propose driveway culverts, however, there is no evidence in the record that supports the commission's statement concerning the implications resulting from a lack of driveway culverts.
The commission, again relying on the Staff Review and Recommendation (Record Item I-32, p. 6), maintained that "[w]ith respect to storm water runoff, we can anticipate increased volumes of water, decreased soil and groundwater recharge of water, increased scour and erosion of soil due to concentrated flows of water . . . and pollution of Great Brook due to . . . sediment from uncontrolled runoff from the subdivision road and the fertilizers, herbicides and pesticides associated with residential lawn areas." (Emphasis provided.) (Record Item I-54, p. 6.) The plaintiff's expert argued that there would be no increase in runoff, no decrease in recharge, and no concentrated flow. (Record Item I-32, p. 4.) However, the plaintiff's expert did admit that there might be a problem associated with the fertilizers from the lawns (Record Item I-48, p. 4), which of course is true in any residential area.
The commission addressed the issue of flooding in the area by noting that the "increased and detained runoff from the development will cause. . . an increase in flooding of the area." (Record Item I-54, p. 7.)
The Staff Review and Recommendation provided:
 The Morehouse Lane crossing of Great Brook is presently mapped as a FEMA "A" zone with a 300 foot width and 5 foot depth of water over the road for the 100 year storm. The Morehouse CT Page 6333 Lane culvert now overtops and floods the road on a one to two year frequency. The increased runoff from the development will cause an unnecessary commensurate cumulative increase in flooding of this area.
(Record Item I-32, p. 6.)
The neighbors echoed the concerns expressed in the Staff Review and Recommendation.
Additionally, the commission found that "[n]o land is provided for necessary storm water detention, ground-water recharge or biofiltration to improve storm water runoff quality . . . ." (Record Item I-54, p. 8.) Again the commission's finding is supported by the Staff Review and Recommendation. (See Record Item I-32, p. 7.) The plaintiff's expert addressed this matter at the October 3, 1989 public hearing by declaring that "I still say that we have so much land between any proposed construction except for one lot and the wetland that there's ample room for storm water absorption into this meadowland, filtration through that land and also storm water detention." (Record Item I-48, pp. 4-5.)
The commission admitted that "[t]he typical soil and erosion control details normally indicated [in] a conceptual site plan are present, but they are inadequate in a development containing such a sensitive and valuable regulated area as does this one." (Record Item I-54, p. 9.) There is no technical evidence to support this conclusion.
"Appellate review of an agency's decision is of limited scope. The reviewing court does not make a broad, de novo review of the record. It does not redetermine factual issues or weigh of the record. It does not redetermine factual issues or weigh the credibility of witnesses, as those matters are within the exclusive province of the agency." Kaeser v. Conservation Commission, 20 Conn. app. 309, 311 (1989) (citing Huck v. Inland Wetlands and Watercourses Agency, 203 Conn. 525,541 (1987)). "The evidence to support any such reason must be substantial . . . ." Id. at 540.
In Feinson v. Conservation Commission, 180 Conn. 421 (1980), the Connecticut Supreme Court found that a trial court properly sustained a plaintiff/applicant's appeal because the record did not reveal sufficient reliable evidence to sustain the defendant/commission's denial of the plaintiff's application. Id. at 427. In Feinson, the record evidence consisted of the plaintiff's application and a report submitted by the CT Page 6334 plaintiff's expert witness, an interrogation of the expert witness at the public hearing, a discussion held at a public hearing, and the knowledge of commission members derived from a viewing of the site. Id. at 425.
The court emphasized that "no other evidence contesting the plaintiff's application was presented to the commission, nor did any other commission member, so far as the record discloses, makes a comprehensive presentation with regard to the plaintiff's application. The only expert evidence was that offered by the plaintiff, and that the commission impliedly rejected." Id. at 427. The court noted that the "sparsity of reliable evidence in this record is underscored by the fact that the commission, in relying on its own knowledge and experience, acted in a manner which placed its data base beyond the plaintiff's scrutiny" because "[n]o where in public hearing, or at any other time and place, was the plaintiff afforded a fair opportunity to hear the commission's fears and to attempt to allay them." Id. at 428.
The commission's decision in this matter is almost a verbatim recitation of the Conservation Director's Staff Review and Recommendations.
The commission members did not engage in "active and probing questioning" of the plaintiff's expert at the public hearings, concerning Application 89-7, (See Record Items I-35, I-48.)
The court has compared the record in the original application (#89-2) with that in the current application (#89-7) to ascertain whether the agency's decision on the current application is based on substantial evidence. If the original application was denied solely because of the issues related to the road, it would be fundamentally unfair for the commission to then deny the current application (from which all issues relating to the road are absent) unless either the application changed, or the conditions of the subject property changed. If the application is the same and the land is the same, and if there is no substantial evidence that the first application failed for any reason other than the road issues, it is hard to avoid the conclusion that the current decision was unfairly reached: a result searching for a rationale.
The court finds that the commission's denial of the permit in application #89-2 (the original application), insofar as it rests on substantial evidence, was based on the misgivings and reservations of the Conservation Director as to the proposed road improvements. In the Commission Findings (May 22, 1989), under "Anticipated Impact", pp. 5-7, There are three areas of concern set forth. Two of these issues are entirely CT Page 6335 road-related and the third (Sec. B, "Stormwater") has to do with the location of a stormwater detention basin, which location appears to be at the direction of the commission staff. The "Stormwater" section does not rest on substantial evidence, inasmuch as the location of the basin was at the behest of the commission staff, therefore, the earlier denial rests on the issues related to the road expansion and improvement.
A search of the record of Application #89-2 reveals that the presence or absence of a soil map was also considered to be a defect in the earlier application. See Minutes of April 5, 1985, pp. 15-37. It appears that, insofar as the staff recommended denial of #89-2, the absence of the map loomed large in their reasons. This technical defect is no longer an issue in the current matter. The court finds that there is nothing different in the second application except the road. The court also finds that there is nothing different in the subject property which would support a denial based on nonroad-related matters since the first application. No evidence has emerged of a probative and reliable nature that was not in the first application proceeding that would justify a denial based on issues other than the road at this time.
The limits on an agency's discretion are described in Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 536
(1987).
 Hearings before administrative agencies, such as this agency, although informal and conducted without regard to the strict rules of evidence, "must be conducted so as not to violate the fundamental rules of natural justice." Connecticut Fund for the Environment, Inc. v. Stamford, 192 Conn. 247, 249, 470 A.2d 1214
(1984); see Pizzola v. Planning 
Zoning Commission, 167 Conn. 202, 207, 355 A.2d 21 (1974). "Due process of law requires not only that there be due notice of the hearing in parties involved have a right to produce relevant evidence, and an opportunity to know the fact on which the agency is asked to act, to cross-examine witnesses and to offer rebuttal evidence. Connecticut Fund for the Environment Inc. v. Stamford, supra; see Welch CT Page 6336 v. Zoning Board of Appeals, 158 Conn. 208, 212-13 257 A.2d 795 (1969). There is no question that the plaintiff was also entitled to have her application heard and determined by an impartial and unbiased agency.
Id.
When determining the question of whether "substantial evidence" supports the denial of the application without reference to the road, the court can not substitute its evaluation of the evidence for the agency's, but the bottom line is fairness:
 We have said that an administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair. Manor Development v. Conservation Commission, 180 Conn. 692, 697, 433 A.2d 999 *(1980).
Id at 542.
When an agency chooses to disregard expert testimony, relying instead on the opinions of the lay members of the commission, or the fears of neighbors, or any other evidence, the agency is obliged to set forth the evidence it has chosen to accept. See Feinson v. Conservation Commission, 180 Conn. 421, 428-429
(1980):
 If an administrative agency chooses to rely on its own judgment, it has a responsibility to reveal publicly its special knowledge and experience, to give notice of the material facts that are critical to its decision, so that a person adversely affected thereby has an opportunity for rebuttal at an appropriate stage in the
 Parsons v. Board of Zoning Appeals, 140 Conn. 290, 292-93, 99 A.2d 149
(1953); cf. Western Alfalfa Corporation v. Air Pollution Variance CT Page 6337 Board, 510 P.2d 907, 910
(Colo.App. 1973), rev'd on other grounds, 416 U.S. 861, 94 S.Ct 2114, 40 L.Ed.2d 607 (1974); and see 2 Davis Administrative Law Treatise 14.13, n. 10, p. 325 (1958). Id.
In the instant case the commission did not do so. The decision contains mere speculation as to the impact on drainage along Morehouse Lane. The commission's decision turns on speculative considerations concerning matters not a part of the application or record before it. Ms. Slayback, who testified as an expert for the neighbors opposed to the plan, directed her remarks to issues raised by the road expansion, taking the position that such issues must be addressed in the pending application. See Minutes of Oct. 3, 1989, p. 28 ("I had to, in good conscience, evaluate the fact that. . . you have to have standard roads. . . .")
No substantial, reliable and probative evidence is found in the record as to shortcomings unrelated to the road expansion. The record contains no substantial evidence from qualified individuals that in any way supports the conclusions contained in the Commission Decision.
While the agency is not bound by its determination in the earlier application per se as to the facts found, the juxtaposition of an earlier denial, which took the form of "it's okay except for the road," and a later denial, which takes the form of "it's not okay even without the road," raises a question as to the fundamental fairness of the agency's decision-making process.
The Court finds that the commission, in denying the plaintiffs application, relied almost completely on the Staff Review and Recommendation (Record Item I-32), which for the above reasons this court finds tainted and not reliable evidence. The court finds that defendant commission's partial denial of the plaintiff's application was not supported by reliable or substantial evidence, was illegal, arbitrary and capricious, and in abuse of its discretion.
The court hereby sustains the plaintiff Manatuck's appeal and correspondingly dismisses the appeal of Gaynor et al. Application 89-7 is remanded to the defendant Commission for action not inconsistant with this decision.
DEAN, Judge CT Page 6338
 FOOTNOTE
The defendant commission states that it based its decision on two files. One file concerned Application No 89-7; the other file dealt with a previous application submitted by the plaintiff, Application No. 89-2. Each file contains separately numbered record item. The designation "Record Item I" will refer to the items included in the record in connection with Application No. 89-7; "Record Item II" will refer to the items included in the record in connection with Application No. 89-2.